**IMPRISONED CITIZENS UNION, et. al.**

v.

**Milton SHAPP, et. al.**

Civ.A.Nos. 70–3054, 70–2545, 71–513 and 71–1006.

United States District Court, E.D. Pennsylvania.

April 27, 1998.

As Amended May 4, 1998.

588

Stefan Presser, Philadelphia, PA, for Plaintiff.

Sarah A. Vandenbraak, Camp Hill, PA, Francis R. Filipi, Harrisburg, PA, for Defendant.

## MEMORANDUM

DUBOIS, District Judge.

This matter is before the Court on defendants' Motion to Terminate All Outstanding Orders for Prospective Relief pursuant to the Prison Litigation Reform Act ["PLRA" or "the Act"], Pub.L. No. 104–134, 110 Stat. 1321 (1996) (codified in part at 18 U.S.C. § 3626), filed September 23, 1997 (Doc. No. 775), plaintiffs' Motion in Opposition to Defendants' Motion to Terminate Preliminary Relief and in the Alternative to Declare the Prison Litigation Reform Unconstitutional or to Certify the Transfer of This Action's Consent Decree with Related Orders to the Commonwealth Court of Pennsylvania, filed September 24, 1997 (Doc. No. 776), plaintiffs' Motion to Have Defendants and Their

1. The Amended Motion for Contempt supplements plaintiffs' Motion to Have Defendants and Their Agents Held in Civil Contempt. The Court will hereinafter refer to these two Motions as plaintiffs' contempt motions.

Agents Held in Civil Contempt, filed October 8, 1997 (Doc. No. 778), and plaintiffs' Amended Motion for Contempt, filed October 28, 1997 (Doc. No. 797).[1] In addition to the submissions of plaintiffs and defendants, the Court has considered the position of the United States government which intervened in the case pursuant to 28 U.S.C. § 2403(a) and submitted a Memorandum of Law Concerning the Constitutionality of the Challenged Provisions of the Prison Litigation Reform Act (Doc. No. 791). Oral argument was heard on November 19, 1997. For the reasons set forth below, the Court concludes that the termination provisions of the Prison Litigation Reform Act at issue are constitutional. Accordingly, the Court will grant defendants' Motion to Terminate All Outstanding Orders for Prospective Relief, deny plaintiffs' Motion to Declare the Prison Litigation Reform Act Unconstitutional and deny plaintiffs' motion to Certify the Transfer of the Consent Decree and Related Orders to the Commonwealth Court of Pennsylvania. The Court will also deny plaintiffs' contempt motions.

## I. BACKGROUND

### 1. History of the Case

Between 1970 and 1971 four related cases challenging the constitutionality of conditions and policies at the seven Pennsylvania State Correctional Institutions ("SCIs") then in operation[2] were filed in this Court. On May 22, 1978, after those suits had been consolidated and a plaintiff class certified, then-Chief Judge Joseph S. Lord, III approved a Consent Decree which settled the majority of issues raised by the plaintiff class. At that time, the Court expressly retained jurisdiction over the Decree. Since then, numerous issues have been addressed in subsequent opinions of the Court and various stipulations and amendments to the Decree have been approved by the Court.[3]

2. SCI Graterford, SCI Muncy, SCI Rockview, SCI Huntingdon, SCI Dallas, SCI Camp Hill, and SCI Pittsburgh.

3. These include a 1980 Stipulation (approved January 8, 1980), a 1981 Stipulation (approved May 13, 1983), a 1981 Amendment to Stipulation

In its current form, the Consent Decree and its amendments govern many aspects of the daily operations of the seven SCIs. The Decree required defendants to establish a code of conduct specifying both that behavior which was punishable—a misconduct—and the type of punishment which could be imposed. The Decree also gives inmates certain rights when charged with a misconduct, including written notice, a hearing, the right to prepare and be assisted in presenting a defense, and the right to written findings. Among its detailed procedures, the Decree governs such things as: the handling of inmate mail; the right of inmates to obtain and keep outside publications; minimum inmate health care requirements; the use of force, restraints and mace by prison officials; the information which must be provided to new inmates; the procedures for conducting cell searches; the right of inmates to visitors; the minimum inmate housing conditions; and the right of inmates to wear civilian clothing.

In 1980, the plaintiffs filed a contempt motion in which they alleged that defendants' were not complying with a number of the provisions of the Consent Decree. On December 30, 1980, with the assistance of United States Magistrate Judge William F. Hall, the parties stipulated to the dismissal of the motion for contempt and with the further assistance of Magistrate Judge Hall, the 1980 Stipulation was amended by an agreement of the parties and eventually approved by Judge Lord on May 11, 1983 [hereinafter the "1983 Amendment to Stipulation"]. Some of the procedures established by the Consent Decree were modified by the 1983 Amendment to Stipulation, principally the grievance and misconduct procedures. The 1983 Amendment to Stipulation also addressed issues involving medical care, inmate law libraries, cell search procedures and administrative detention.

The current round of litigation began when defendants filed a Motion to Terminate, seeking to end their obligations under the Consent Decree pursuant to the termination provisions of the PLRA. *See* 18 U.S.C. § 3626(b)(2). Plaintiffs countered with multiple filings: the first seeks to have the

(approved May 13, 1983), and a 1982 Agreement

PLRA declared unconstitutional or to have the case transferred to the Commonwealth Court; the others seek to have defendants held in civil contempt.

### 2. Issues Presented

The first, and primary, issue presented is whether the termination provisions of the PLRA are constitutional. Plaintiffs have mounted a multi-prong constitutional attack on these provisions, alleging that they violate the separation of powers embodied in Article III, the due process clause of the Fifth Amendment, the equal protection rights inherent in the Fifth Amendment, and, in a passing reference, the Tenth Amendment's reservation of unenumerated powers to the states. If the Court finds that the termination provisions survive these challenges, it must decide whether, under the PLRA, defendants have satisfied the requirements for termination. Next, the Court must turn to the question of how plaintiffs' contempt motions interact with the PLRA's termination provisions and defendants right to terminate the Decree. Plaintiffs argue that even if the termination provisions are constitutional, defendants' contempt requires this court to stay application of those provisions, either by holding defendants' Motion to Terminate in abeyance or dismissing it until the contempt is purged; plaintiffs premise this argument on the Court's inherent contempt power. Alternatively, plaintiffs' seek to bar defendants from proceeding under the equitable doctrine of "unclean hands." Defendants respond that there is no authority for such action and reiterate their position that the Court should end its supervision of the Consent Decree and its modifications by ordering termination of the Decree. Finally, if defendants are entitled to relief, the Court must decide what is appropriate.

### a. The PLRA's Termination Provisions

■ The termination provisions of the PLRA, 18 U.S.C. § 3626(b)(2), recite that defendants are "entitled to immediate termination of any prospective relief if the relief was approved or granted in the absence of a

(approved May 13, 1983).

finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." [4] Under 18 U.S.C. § 3626(b)(3), a court may not terminate relief if it finds that there is a "current and ongoing violation of the Federal right" [5] and that the relief is narrowly drawn, extends no further than necessary and is the least intrusive means possible to correct the violation. (Plaintiffs in this case have expressly declined to attempt to establish that there is a "current and ongoing violation" of a federal right.) Moreover, the court must "promptly rule on any motion to modify or terminate prospective relief in a civil action with respect to prison conditions." *Id.* at § 3626(e)(1).[6] Prospective relief is defined as "all relief other than compensatory monetary damages," *id.* § at 3626(g)(7) and relief expressly includes "consent decrees." *Id.* at § 3626(g)(9).

### b. Background of the Contempt Motions

Of particular importance to the current contempt motions is the 1983 Amendment to Stipulation. Plaintiffs' contempt motions involve the issue of whether provisions in the 1983 Amendment to Stipulation bind defendants to specific time lines for the resolution of prisoner grievances and misconducts. The 1983 Amendment to Stipulation states that "[d]efendants shall within 60 days of the approval of this Amendment submit to counsel for the plaintiff-class, a proposal for an administrative grievance procedure for the processing of allegations by any member of the plaintiff-class...." 1993 Amendment to

Stipulation ¶ I.B.1. In addition, the 1983 Amendment to Stipulation clearly details procedures for misconduct proceedings, including the requirement that the "Program Review Committee shall render its decision within five (5) working days of receipt of an appeal" and that the Superintendent must forward his decision to the inmate within three working days of his receipt of an appeal of the Program Review Committee's decision.

In a Report and Recommendation dated May 5, 1983, Magistrate Judge Hall made detailed findings with respect to, and recommended approval of, the 1983 Amendment to Stipulation. Included in those findings was a lengthy discussion of the Consolidated Inmate Grievance Review System submitted by defendants pursuant to the 1983 Amendment to Stipulation and the time line for this review; the time line required the Inmate Grievance Coordinator to respond within ten days to a grievance; thereafter an inmate was permitted five days to appeal a decision to the Superintendent who then had to reach his or her own decision within ten days of the appeal. The Superintendent's decision was further appealable within seven days to the three-person Central Office Review Committee ("CORC") which had twenty-one days to reach a decision. This system, and these time lines, were codified in DC–ADM 804 and remained in force until November 1, 1997. *See* Stipulation of Uncontested Facts ¶ 25. Magistrate Judge Hall's Report and Recommendation was approved and adopted by Judge Lord by Order dated May 11, 1983.[7]

---

**4.** Prior to enactment of the PLRA, it is unlikely that a court would have made such findings in any case involving a consent decree. No law prior to the PLRA required such findings and because a consent decree embodies an agreement between the parties, there would have been no need for such findings. This case is no exception: no findings meeting the standards of the PLRA were made with respect to the Consent Decree or its amendments.

**5.** On November 27, 1997, the PLRA was amended by Pub.L. No. 105–119, § 123, 111 Stat. 2440 (1997) which, among other provisions, replaced "current or ongoing violation" with "current and ongoing violation." Congress provided that the amendments "shall take effect upon the date of

the enactment of this Act and shall apply to pending cases." *Id.* at § 123(b).

**6.** Under the November 27, 1997 amendments, parties may now bring a mandamus action "for any failure to issue a prompt ruling...." Pub.L. No. 105–119, § 123(a)(3)(A) (codified at 18 U.S.C. § 3626(e)(1)).

**7.** The Order of May 11, 1983 was signed by Judge Lord. Defendants have noted, however, that neither the Court, the Clerks office nor any party have a copy of the 1983 Amendment to Stipulation which bears the signature of Judge Lord, although all copies of the 1983 Amendment to Stipulation do bear the signatures of the party representatives. Defendants suggest that the fail-

Plaintiffs contend in their contempt motions that the time lines are binding on defendants, that defendants have failed to abide by the time lines, and that that failure constitutes contempt on the part of defendants. In response, defendants argue that they are not bound by the grievance procedures set forth in the Report and Recommendation but only by those procedures contained in the body of the 1983 Amendment to Stipulation itself which does not include the details of the Grievance Review System. They have also stipulated that "[f]rom January 1, 1996, through the middle of 1997, the defendants and their agents have failed in a significant number of instances to respond to inmate grievances and appeals therefrom within the time frames described in Magistrate [Judge] Hall's Report and Recommendation." Stipulation of Uncontested Facts, ¶ 24.

As of November 1, 1997, defendants amended DC–ADM 804 to require only one member of CORC to participate in any given appeal. They argue that this step will streamline the grievance procedure and thus will benefit the plaintiff-class by increasing the prison authority's response time to grievances.[8] Plaintiffs contend that defendants may not change these procedures because they are bound by the time lines detailed in Magistrate Judge Hall's Report and Recommendation.

Defendants also acknowledge that "[f]rom January 1, 1996, through the middle of 1997, there have been instances where defendants and their agents have failed to respond to inmate misconduct appeals within the time

delineated in Magistrate Judge Hall's Report and Recommendation." Stipulation of Uncontested Facts ¶ 31. Defendants add that the procedures outlined by Magistrate Judge Hall exceed those recommended by the American Correctional Association ("ACA"), *id.* at ¶¶ 27–30, and that they intend to amend the procedures and bring them into conformity with the ACA standards if the Consent Decree is terminated. *Id.* at ¶ 32. Defendants further insist that the instances of non-compliance with the misconduct time lines do not amount to a system or institution-wide violation and thus, under the terms of the consent decree, plaintiffs may not seek contempt sanctions.[9]

In addition to the alleged failure of defendants to abide by the time frames set forth in the 1983 Amendment to Stipulation and Magistrate Judge Hall's Report and Recommendation, plaintiffs seek to prevent defendants from changing the regulation governing what type of clothing inmates may wear. The regulation in force until November 26, 1997 allowed inmates to wear various types of civilian clothing, including T-shirts and sweatshirts with commercial logos. *See* DC–ADM 815; Stipulation of Uncontested Facts ¶ 6. The new regulation will effectively limit inmates to a narrow range of approved clothing that is either white or cocoa brown and which does not display any logo, trademark or brand name. *See* Stipulation of Uncontested Facts ¶ 16. The consequence is that prisoners were required to dispose of those clothes in their possession which did not satisfy the new regulation before that regula-

<hr>

ure of Judge Lord to sign the Amendment to Stipulation casts its legitimacy into question. The Court rejects this argument. All parties have, since 1983, treated the Amendment to Stipulation as binding; all parties signed it; Magistrate Judge Hall clearly recommended that it be approved and Judge Lord just as clearly approved it. The Court shall, therefore, treat it as a binding amendment to the Consent Decree.

8. Plaintiffs initially agreed to this new streamlined procedure, but withdrew their agreement because of concerns that the proposed procedure would limit the right of inmates to appeal adverse decisions to the Commonwealth Court under *Kisner v. Commonwealth of Pennsylvania,* 683 A.2d 353, 355–56 (Pa.Commw.1996) (holding that the Central Office Review Committee performed "state-wide policy making functions"

and thus its decisions are appealable to the Commonwealth Court). For the reasons discussed in Part III of this Memorandum, the Court will not address this issue.

9. The Consent Decree provides that "[p]laintiff's ... reserve the right to contest in this Court, at any time, by any appropriate legal proceeding, any institution or system wide pattern of failure or refusal by the defendants or their agents or employees to follow the provisions of this Consent Decree." Consent Decree ¶ XIX (emphasis added). The Decree also states that the "Decree shall not create a private cause of action in any individual against any of the defendants. Nor, except as provided in paragraph XIX above, shall this decree provide a basis for contempt proceedings." Consent Decree ¶ XXIII.

tion went into effect on November 26, 1997. Possession of non-conforming clothes became punishable on December 26, 1997. *Id.* at ¶ 18.

Plaintiffs seek to have defendants held in contempt on the ground that the new clothing regulation violates the original Consent Decree. With respect to that issue, the Consent Decree provides that "[d]efendants shall permit residents to wear civilian clothing when the residents are housed in general population except to the extent that the superintendent of each institution requires institutional issue to be worn for work. However, defendants reserve the right to require residents to wear specific articles of clothing issued solely for the purpose of visitation during a resident's presence in the visiting areas of the institution. Furthermore, defendants reserve the right to impose reasonable regulations with respect to civilian clothing on the basis of safety, sanitary and security considerations." Consent Decree ¶ XVII.

After the escape of six prisoners on January 8, 1997, Commissioner of Corrections Martin Horn released a Report detailing the causes of, and concerns relating to, that escape. *See Id.* at ¶¶ 9–14. The report detailed "Primary Causes of Escape" and "security lapses that allowed escape." The parties have stipulated that "[t]he issue of inmate access to civilian clothing is listed only thereafter in the report as a concern related to the escape." *Id.* at ¶ 14. Defendants cite this security concern as a principal reason for the change in clothing policy.[10]

Plaintiffs also seek to have defendants held in contempt based on defendants' alleged failure to provide inmates access to health care through sick calls on weekends. The Consent Decree provides that at "all Bureau of Corrections facilities which provide inpatient treatment for inmates, the Bureau shall provide twenty-four (24) hour medical care to such inmates.... [And][t]here will be daily sick call at all institutions by a properly trained health professional." Appendix A to Consent Decree, ¶¶ 4–5.

Initially, because counsel for the plaintiff class lacked evidence to support the weekend sick call claim, it was voluntarily withdrawn. After the hearing on the pending motions, however, members of the plaintiff class filed Plaintiffs' Objections to Portions of the "Stipulation of Uncontested Facts," filed December 16, 1997 (Doc.No.828). In this filing, three members, John M. Payne, Stanley J. Hertzog and James (Sonny) Watson, stated in affidavits that in the past, it had been the defendants' practice to provide sick calls on a daily basis. Given this new information, counsel for plaintiffs' class seeks both to reinstate the contempt claim based on inadequate health care and to have the affidavits introduced into evidence. The Court granted the requested relief.[11]

### 3. Conclusion—Summary

The Court has carefully considered both the oral arguments and written submissions of the parties and concludes that the termination provisions of the Prison Litigation Reform Act are constitutional. As such, because the requirements of those provisions

10. Six members of the plaintiff class—Jon E. Yount, David S. Kopac, Derek S. Smith, Guy Bicking, James Alan Romberger, and Kenneth W. Teater—submitted Plaintiffs' Objections to Portions of "Stipulation of Uncontested Facts," filed December 16, 1997 (Doc.No.828) in which they alleged that "agents" for the defendants delayed their receipt of the Stipulation of Uncontested Facts. As a result, they could not timely inform their counsel of alleged errors in the Stipulation. They have two principal sets of objections. The first is that there are discrepancies and errors in the facts regarding the clothing regulations. These alleged discrepancies and errors are used to support an argument that defendants have amended the clothing regulations, not as a safety measure, but, because the newly re-

quired clothing is manufactured at a correctional institution, as a fiscal one. Plaintiffs' counsel did not advance this argument and has not moved to amend the contempt motions. By separate Order dated April 27, 1998, the Court has overruled this first set of objections. The second principal set of objections asserted by the above-named plaintiffs involves the conduct of sick calls—addressed in more detail below in the body of the Memorandum. At the request of plaintiffs' counsel, the Court has included this claim in its consideration of plaintiffs' contempt motions. *See Id.*

11. The Court granted the requested relief by separate Orders dated April 27, 1998.

are met, the Court will terminate the relief provided by the Consent Decree and its amendments. The Court also concludes that it should take this action regardless of whether defendants are currently violating provisions of the Consent Decree. Therefore, to the extent plaintiffs seek coercive sanctions—that is, sanctions which force defendants to comply with the terms of the Consent Decree—the Court need not, and will not, reach the issue of whether defendants are in contempt. To the extent, however, that plaintiffs seek compensatory sanctions—that is, sanctions ordering defendants to compensate plaintiffs for the loss of their civilian clothing—the Court finds that defendants have not violated the provisions of the Consent Decree governing inmate clothing.

## II. CONSTITUTIONALITY OF THE TERMINATION PROVISIONS OF THE PRISON LITIGATION REFORM ACT

Plaintiffs have challenged the constitutionality of the termination provisions of the Prison Litigation Reform Act on many grounds. They principally argue that the PLRA: violates separation of powers; denies due process; and abridges the right of inmates to equal protection of the law.[12] The Court examines each of these grounds below. First, however, it must address a preliminary issue.

Plaintiffs argue that the Court must examine the statute as a whole in determining whether it is constitutional. It would be improper, they contend, to examine the termination provisions outside the context of the other provisions—such as the limits on federally enforceable settlements, 18 U.S.C. §§ 3626(a)(1)(A), 3626(c), on the duration of relief, *id.* at 3626(b), on preliminary injunctions, *id.* at 3626(a)(2), and on the right of prisoners to proceed *in forms pauperis,* 28 U.S.C. § 1915, to name just a few. This

impropriety exists, they argue, because, while any one provision might withstand constitutional scrutiny, when taken together, the PLRA's provisions unfairly burden prison inmates and are thus unconstitutional. Plaintiffs cite *Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1994) for the proposition that courts, when determining whether a statute measures up to constitutional norms, should look at the entire statute.

The Court rejects the approach advanced by plaintiffs. It will not examine the constitutionality of the PLRA in its entirety. *Romer* involved a facial challenge to an entire statute and the Supreme Court therefore examined the statute as a whole. *See id.* at 1623; *see also Dougan v. Singletary,* 129 F.3d 1424, 1427 n. 15 (11th Cir.1997). In this case, only the termination provisions of the PLRA are at issue, and the Court will address only those provisions.

The Court turns, therefore, to plaintiffs' first argument: that the termination provisions violate Article III's separation of powers both by reopening a final judgment and prescribing a rule of decision.

### A. Separation of Powers

"In republican government the legislative authority, necessarily, predominates." The Federalist No. 51, 350 (James Madison) (J.E. Cooke ed., 1961). This truism has meant that the "Court has declined to adopt formalistic and unbending rules.... [in order not to] unduly constrict Congress' ability to take needed and innovative action pursuant to its Article I powers." *Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 851, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) (holding that act giving Commodities Futures Trading Commission power to entertain state law counterclaims does not violate Article

---

**12.** To date, six circuits have examined similar attacks on the constitutionality of the PLRA. Five of the six have rejected arguments like those presented by plaintiffs in the case at bar. *See Hadix v. Johnson,* 133 F.3d 940 (6th Cir.1998); *Gavin v. Branstad,* 122 F.3d 1081, 1088–89 (8th Cir.1997); *Dougan v. Singletary* 129 F.3d 1424, 1427 (11th Cir.1997); *Inmates of Suffolk County Jail v. Rouse,* 129 F.3d 649, 656–57 (1st Cir. 1997); *Plyler v. Moore,* 100 F.3d 365, 372 (4th

Cir.1996). The Second Circuit, although holding in the face of similar arguments that the PLRA is constitutional, did so only after construing the language of the termination provision as requiring only termination of relief, not of the decree itself. *See Benjamin v. Jacobson,* 124 F.3d 162 (2d Cir.1997), *reh'g held en banc* February 25, 1998. The Third Circuit has yet to speak to these issues.

III) (citations omitted). At the same time, however, a court must examine legislation "with an eye to the practical effect that the congressional action will have on the constitutionally assigned role of the federal judiciary ... [and must consider] the extent to which the 'essential attributes of judicial power' are reserved to Article III courts.... the origins and importance of the right to be adjudicated, and the concerns that drove Congress to depart from the requirements of Article III." *Id.* (citations omitted).

Plaintiffs argue first that the PLRA is unconstitutional because the termination provisions violate separation of powers. After careful examination, however, the Court must conclude—like six circuits before it— that the PLRA neither reopens a final judgment nor prescribes a rule of decision in violation of the Constitution.

### 1. Reopening Final Judgments

 Plaintiffs contend that by providing for the termination of consent decrees, Congress has violated separation of powers— unconstitutionally encroaching on the judiciary—by reopening a final judgment. The proposition that Congress may not constitutionally reopen final judgments was recently articulated by the Supreme Court in *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995). That case involved an earlier decision, *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), in which the Supreme Court adopted a national limitations period applicable to civil actions under § 10(b) of the Securities Exchange Act of 1934. Unhappy with the result of this uniform statute of limitations, Congress enacted a statute which required courts to reinstate § 10(b) actions which had been pending before *Lampf,* but were then dismissed as a result of the *Lampf* limitations period. Plaut's case was dismissed as untimely in accordance with *Lampf* and no appeal was taken; only after Congress enacted the new statute did Plaut seek reinstatement of his case.

In *Plaut,* the Court concluded that Congress "exceeded its authority by requiring the federal courts to exercise 'the judicial

Power of the United States,' U.S. Const. Art. III, § 1, in a manner repugnant to the text, structure and traditions of Article III." *Plaut* at 218, 115 S.Ct. 1447. Congress did so by "retroactively commanding the federal courts to reopen final judgments," *id.* at 219, 115 S.Ct. 1447, because once a judgment has "achieved finality.... a judicial decision becomes the last word of the judicial department with regard to a particular case or controversy, and congress may not declare by retroactive legislation that the law applicable to that very case was something other than what the court said it was." *Id.* at 227, 115 S.Ct. 1447.

That Congress may not reopen a final judgment is a premise of law which cannot be questioned. The issue presented, though, is whether a consent decree is a "final judgment" for separation of powers purposes. Plaintiffs rely on *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), for the proposition that a consent decree "is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Id.* at 378, 112 S.Ct. 748. As such, the *Rufo* Court said that "a consent decree is a final judgment that may be reopened only to the extent that equity requires." *Id.* at 391, 112 S.Ct. 748.

 It should be noted, however, that these broad statements of law in *Rufo* were made in the context of a discussion of the circumstances that permit a court to modify a consent decree. In general, a "party seeking modification of a consent decree may meet its initial burden by showing.... a significant change either in factual conditions or law." *Rufo,* at 384, 112 S.Ct. 748. Indeed, a "consent decree must of course be modified if, as it later turns out, one or more of [its] obligations has become impermissible under federal law." *Id.* at 388, 112 S.Ct. 748; *see also Agostini v. Felton,* 521 U.S. 203, 117 S.Ct. 1997, 2006, 138 L.Ed.2d 391 (1997) ("A court errs when it refuses to modify an injunction or consent decree in light of ... changes" in decisional or statutory law); *Landgraf v. USI Film Prods.,* 511 U.S. 244, 273, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)

("When the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive."); *System Federation No. 91 v. Wright,* 364 U.S. 642, 652, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961) (a "court will not continue to exercise its powers ... [under a decree] when a change in law or facts has made inequitable what was once equitable"). In contrast to prospective relief which may be modified, an award of monetary damages is truly final, regardless of changes in the underlying law. As the Court put it in *Plaut,* a judgment is final for separation of powers purposes when it is the "last word of the judicial department with regard to a particular case or controversy." *Plaut,* at 227, 115 S.Ct. 1447. A consent decree simply is not the "last word" of a court on a particular case or controversy.

The distinction—between prospective relief and final awards—is best demonstrated in the Supreme Court's early decision in *Pennsylvania v. Wheeling and Belmont Bridge Co.,* 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1855) [hereinafter "Wheeling Bridge"]. In that case, the Supreme Court held that Congress could change the law such that the Court was required to end an injunction it had ordered in an earlier case.

*Wheeling Bridge* arose out of an earlier case in which the Supreme Court had held that a bridge was a public nuisance because it interfered with navigable waters and ordered the bridge raised or removed. After this decision, the bridge was destroyed in a storm; when rebuilding commenced, Pennsylvania sought enforcement of the prior order in an effort to prevent reconstruction of the bridge. In the interim, however, Congress had passed a law making the bridge part of a post-road which could not be interfered with by riparian navigation. This, the Court held in *Wheeling Bridge,* was well within the powers of Congress although it dictated an outcome different from the one the Court had reached in the earlier case, namely, that the prior injunction could not be enforced and the bridge could therefore be rebuilt.

Plaintiffs argue that *Wheeling Bridge* makes a distinction between "public" rights and "private" rights. Congress, they say, has the power to alter prospective relief only where it has plenary power over the underlying law, where, in other words, the underlying law concerns a "public" right. According to plaintiffs, because the consent decree in this case is premised on the constitutional rights of inmates, private rights, Congress may not alter the scope of the Consent Decree. This argument derives from the Supreme Court's statement in *Wheeling Bridge* that: "it is urged, that the act of congress cannot have the effect and operation to annul the judgment of the court already rendered, or the rights determined thereby.... This, as a general proposition, is certainly not to be denied, especially as it respects adjudication upon the *private rights of parties.* When they have passed into judgment the right becomes absolute, and it is the duty of the court to enforce it." *Wheeling Bridge* at 431 (emphasis added). That is far from a holding that the rationale of *Wheeling Bridge* is limited to those cases involving a public right.

The "public" rights doctrine was explored by the Supreme Court in *Northern Pipeline Const. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) in which it was explained that the "doctrine ... draws upon the principal of separation of powers, and a historical understanding that certain prerogatives were reserved to the political Branches of Government." *Id.* at 67, 102 S.Ct. 2858. The doctrine allows Congress to allocate certain types of adjudicatory authority to non-Article III courts hearing cases involving those public rights issues historically "reserved to the political" branches. *See, e.g., Murray's Lessee v. Hoboken Land & Improvement Co.,* 59 U.S. (18 How.) 272, 15 L.Ed. 372 (1855); *Crowell v. Benson,* 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932). While *Wheeling Bridge* did, in part, rely on this public rights/private rights distinction, the doctrine has no place in the instant case.

The distinction made in *Wheeling Bridge* which is important to this case—and one to which the Supreme Court referred when discussing absolute "private" rights—was the distinction between prospective relief and money damages:

Now, we agree, if the remedy in this case had been an action at law, *and a judgment rendered in favor of the plaintiff for damages,* the right to these would have passed beyond the reach of the power of congress. It would have depended, not upon the public right of the free navigation of the river, but upon the judgment of the court. The decree before us, so far as it respect the costs adjudged, stands upon the same principles, and is unaffected by the subsequent law. But that part of the decree, directing the abatement of the obstruction, is executory, a continuing decree, which requires not only the removal of the bridge, but enjoins the defendants against any reconstruction or continuance. Now, whether it is a future existing or continuing obstruction depends upon the question whether or not it interferes with the right of navigation. If, in the mean time, since the decree, this right has been modified by the competent authority, so that the bridge is no longer an unlawful obstruction, it is quite plain the decree of the court cannot be enforced.

*Wheeling Bridge,* 59 U.S. at 431–32 (emphasis added). It is this distinction which ultimately determines the right of Congress to change the law in such a way that relief must be altered or modified. The issue then is not the source or validity of the legal rule producing the judgment, "but rather the immunity from legislative abrogation of those judgments themselves." *Plaut,* at 230, 115 S.Ct. 1447. The Court relied on this distinction in Plaut when it rejected the argument that *Wheeling Bridge* was precedent for Congress' right to reopen judgments. The Court noted in *Plaut* that the statute at issue in

*Wheeling Bridge* "altered the prospective effect of injunctions entered by Article III courts" and that "nothing in our holding today calls [that decision] ... into question." *Plaut,* at 232, 115 S.Ct. 1447.

For purposes of this case then, the only meaningful distinction is that between judgments ordering prospective relief—subject to alteration when Congress changes the applicable law—and judgments awarding damages—which cannot be reopened by Congress. The consent decree in this case provides only for prospective relief Congress has changed the law governing the consent decree.[13] The Court therefore concludes that the PLRA does not unconstitutionally reopen a final judgment. *See Dougan,* 129 F.3d at 1427 ("Consent decrees are final judgments but 'not the last word of the judicial department'" and are thus not final judgments for separation of powers purposes); *Gavin v. Branstad,* 122 F.3d 1081, 1088–89 (8th Cir.1997); *Inmates of Suffolk County Jail v. Rouse,* 129 F.3d 649, 656–57 (1st Cir.1997).[14]

### 2. Rule of Decision

■■■ In 1788 Alexander Hamilton wrote that "the courts of justice are to be considered as the bulwarks of a limited constitution against legislative encroachments...." The Federalist No. 78, 526 (Alexander Hamilton) (J.E. Cooke ed., 1961). This principle is central to our constitutional system of government. Accordingly, Congress may not tell a court how to decide a specific case. *See United States v. Klein,* 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871). However, Con-

---

**13.** Plaintiffs contend that because the Consent Decree settled a suit challenging the constitutionality of prison practices, Congress in establishing termination procedures, is altering the constitutional basis for the relief awarded, which it may not do. The Court rejects this argument. Congress has not attempted to alter the constitutional basis of relief; indeed, under the PLRA plaintiffs are free to establish violations of a federal right which includes constitutional rights. They have not done so in this case.

**14.** Plaintiffs urge the Court to examine the history of Article III, as Justice Scalia did in *Plaut,* and argue that by doing so, it must conclude that the intent of the Framers was precisely to avoid

the type of legislative entanglement in the judiciary as is represented by the PLRA. Indeed, it is true that the "sense of sharp necessity to separate the legislative from the judicial power, prompted by the crescendo of legislative interference with private judgments of the courts, triumphed among the Framers of the new Federal Constitution." *Plaut,* 514 U.S. at 220, 115 S.Ct. 1447. The abuses of pre-Revolutionary legislatures, however, were of the type found in *Plaut:* legislative reversals of *final* judicial decisions. The Court cannot find a compelling reason in this, albeit fascinating, history to alter its conclusion that the Consent Decree is not a final judgment for separation of powers purposes.

gress has a great deal of freedom under Article III to limit the jurisdiction of lower courts, *see, e.g., Sheldon v. Sill,* 49 U.S. (8 How.) 441, 12 L.Ed. 1147 (1850) ("[H]aving a right to prescribe, Congress may withhold from any court of its creation jurisdiction of any of the enumerated controversies."), and, more importantly for the purposes of this case, Congress has the freedom to establish standards by which a court judges a case. *See, e.g., Robertson v. Seattle Audubon Soc'y,* 503 U.S. 429, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992).

■ It is true that the Constitution "commands that the independence of the Judiciary be jealously guarded, and it provides clear institutional protections for that independence," *Northern Pipeline Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 60, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), because the "accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." The Federalist No. 47, 324 (James Madison) (J.E. Cooke ed., 1961). Thus, it is the prerogative of the judiciary to declare "what the law is," and apply that law to the facts before it. *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). This clear delineation of powers was the basis for the Supreme Court's holding that Congress had overstepped its constitutional bounds when it dictated a rule of decision in *Klein.* 80 U.S. (13 Wall.) 128, 20 L.Ed. 519.

*Klein* was decided during the complex political turmoil following the Civil War. A federal statute allowed citizens who had been living in the Confederacy to recover property seized during the war upon proof of their loyalty to the Union, which proof included a demonstration that they had not acted against the Union during the war. By another act, the President was authorized to extend pardons to former Confederates. The President did so in the case of V.F. Wilson whose estate, through its administrator Klein, sought to recover property confiscated by the United States. As proof of Wilson's loyalty, the claimant proffered the presidential pardon. The Court of Claims accepted this proof, although it also found evidence that Wilson had offered aid and comfort to Confederates during the war. Nonetheless, the evidence of the pardon was held to be sufficient demonstration of loyalty and restitution was ordered.

While the case was pending on appeal before the Supreme Court, Congress passed a new law which provided that a Presidential pardon could not be offered as proof in court where a party was advancing a claim against the United States. The statute went on to explicitly strip the Supreme Court of its appellate jurisdiction upon a finding that the pardon was the basis of decision in the lower court. Faced with a statute that stripped the Court of jurisdiction upon making certain findings, the Court held that the statute was unconstitutional, in part, because "the court is forbidden to give effect to the evidence which, in its own judgment, such evidence should have, and is directed to give it an effect precisely contrary." *Klein,* at 147. The effect of the act, in other words, was to "prescribe a rule for the decision of a cause in a particular way." *Id.* at 146.

■ The "rule of decision" doctrine depends on the distinction between a rule prescribing an outcome—which would be unconstitutional—and a change in the underlying law which may of necessity dictate a new outcome—which would be constitutional. Thus, in *Wheeling Bridge,* the Court held that Congress could change the law in such a way that it dictated an outcome different from the one the Court had reached in an earlier case. This distinction, between a rule of decision and a change in governing law, was further explained in *Robertson v. Seattle Audubon Soc'y,* 503 U.S. 429, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992). That case involved a legislative balance between preservation of endangered spotted owls and the economic needs of loggers in the Northwest. Before the change in law at issue in that case, two groups had challenged, in separate cases, certain logging in the Northwest on the basis that the logging effectively killed or "took" spotted owls—an endangered species—in violation of numerous provisions of federal law. During the pendency of these suits, Congress passed legislation which expressly named the

two cases. *See* Section 318 of the Department of the Interior and Related Agencies Appropriations Act, 1990, 103 Stat. 745, popularly known as the Northwest Timber Compromise [the "Timber Act"]. Provisions of the Timber Act—section (b)(3) and (b)(5)—prohibited logging in designated areas. The legislation further directed that "management of areas according to subsections (b)(3) and (b)(5) of this section ... is adequate consideration for the purpose of meeting the statutory requirements that are the basis [for the pending cases]." Section 318(b)(6)(A) of the Timber Act. The Ninth Circuit held that the Timber Act violated Article III because it directed a rule of decision, that is, it dictated the outcomes of the pending cases. *Seattle Audubon Soc'y v. Robertson,* 914 F.2d 1311 (9th Cir.1990). The Supreme Court reversed, holding that the provisions at issue merely modified or amended existing law but did not prescribe an outcome, reasoning that the courts were still required to determine whether the parties met the standards of section (b)(6)(A), namely that management of areas was in accord with subsections (b)(3) and (b)(5). *Seattle Audubon,* 503 U.S. at 438, 112 S.Ct. 1407.

 The distinction between a prescribed outcome and a mere change in governing law can be difficult to make. *See, e.g., Benjamin v. Jacobson,* 124 F.3d at 174 (discussing difficulty of distinguishing between a change in law and a prescribed outcome). In the case at bar, however, the Court concludes that the statute at issue simply effects a constitutionally permissible change in law. That is, the PLRA establishes a new standard, but leaves it to the courts to apply that standard. In the words of the Fourth Circuit:

> While § 3626(b)(2) requires a district court to terminate prospective relief that was approved in the absence of a finding that the relief is no greater than necessary to correct the violation of a federal right, it does not purport to state how much relief is more than necessary. In short, § 3626(b)(2) provides only the standard to which district courts must adhere, not the result they must reach.

*Plyler v. Moore,* 100 F.3d 365, 372 (4th Cir. 1996).

Plaintiffs in this case could have presented evidence of a "current and ongoing violation" of a federal right in an attempt to qualify under the new standard set forth in the PLRA. Had they done so, the Court would have applied the new law to the facts adduced—it would have determined whether the evidence established a current and ongoing violation and whether to terminate or modify relief under the PLRA. It cannot be said, therefore, that Congress is prescribing a rule of decision or that the PLRA is an unconstitutional encroachment on the judiciary because the Court is able to apply the provisions of the new law to the facts presented and decide what relief, if any, is appropriate. *See also Dougan v. Singletary,* 129 F.3d at 1427; *Gavin v. Branstad,* 122 F.3d at 1088; *Inmates of Suffolk County Jail v. Rouse,* 129 F.3d at 657–58.

### B. Due Process

#### 1. Vested Rights

 Plaintiffs argue that under the Fifth Amendment's due process clause, a judgment, once vested, cannot be abrogated by an action of Congress. *See McCullough v. Virginia,* 172 U.S. 102, 123–24, 19 S.Ct. 134, 43 L.Ed. 382 (1898). While true, "the vested rights doctrine is really only the due process analogue of separation-of-powers doctrine that prevents Congress from reopening final judgments of Article III courts ... [and] a judgment that is not final for purposes of separation of powers is also not final for purposes of due process." *Gavin,* 122 F.3d at 1091. Thus, the Court's discussion of final judgments in the context of separation of powers above, amply answers this argument: a prospective order cannot become vested for due process purposes.

Plaintiffs also rely on cases holding that consent decrees "resemble" contracts, *see, e.g., Local No. 93, Int'l Assoc. of Firefighters v. Cleveland,* 478 U.S. 501, 519, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986), and analogize the vested right in a consent decree to rights in property which, once acquired, cannot be defeased without due process. However, injunctive relief of the type mandated by the

Consent Decree has a prospective effect and litigants have "no 'vested right' in the decree entered by the trial court." *Landgraf*, 511 U.S. at 247, 114 S.Ct. 1483 (citing *American Steel Foundries v. Tri–City Central Trades Council*, 257 U.S. 184, 201, 42 S.Ct. 72, 66 L.Ed. 189 (1921)). Moreover, "[f]ederal regulation of future action based upon rights previously acquired by the person regulated is not prohibited by the Constitution. So long as the Constitution authorizes the subsequently enacted legislation, the fact that its provisions limit or interfere with previously acquired rights does not condemn it." *Fleming v. Rhodes*, 331 U.S. 100, 107, 67 S.Ct. 1140, 91 L.Ed. 1368 (1947).

The Court therefore concludes that plaintiffs do not have a vested right in the Consent Decree under the Fifth Amendment. Accordingly, the PLRA, by authorizing termination of prospective relief, does not deprive plaintiffs of property without due process. *See also Dougan*, 129 F.3d at 1427; *Gavin*, 122 F.3d at 1091; *Inmates of Suffolk County Jail*, 129 F.3d at 658 (holding that because a consent decree ordering prospective relief must be open to modification if there is a change in law or circumstances, it cannot become vested); *Plyler v. Moore*, 100 F.3d 365, 374 (4th Cir.1996).[15]

### 2. Contract Rights

Plaintiffs urge the Court to find that Congress has impermissibly impaired their contract with the Commonwealth—the Consent Decree—in violation of the Due Process Clause of the Fifth Amendment. Defendants counter that the Consent Decree is not a contract for purposes of the Due Process clause. The Court will nonetheless assume, without deciding, that the Consent Decree is a contract for purposes of this discussion. *See Rufo*, 502 U.S. at 378, 112 S.Ct. 748 ("A consent decree ... in some respects is contractual in nature.").

 Normally when examining a federal statute which affects a private contract, a court must engage in a deferential analysis, finding the statute unconstitutional only if it is arbitrary and irrational. *See Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 472, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985). Plaintiffs argue that in this case, the Court should engage in heightened scrutiny because the state government, in seeking to terminate a decree to which it is a party, is impairing its own "contract." *See Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). The Court rejects this invitation to engage in an enhanced scrutiny of the PLRA. The federal government—the government which enacted the PLRA and thereby established the standard for termination—is clearly not a party to the Consent Decree in this case and where "the Government [enacting the legislation] is not a party to the contract at issue, ... there is no reason to argue for a heightened standard of review." *Nat'l R.R. Passenger Corp.*, at 472 n. 24, 105 S.Ct. 1441. Thus, a heightened standard of review is not appropriate. Instead, the Court will examine the statute only to determine whether it is arbitrary and irrational, a test which is a Due Process equivalent of the rational basis test under the Equal Protection Clause.

 As the Court explains more fully below in its discussion of plaintiffs' Equal Protection challenge, the PLRA cannot be deemed to be arbitrary and irrational. Whether one agrees with the purposes motivating passage of the PLRA, for the reasons stated below, it cannot be questioned that it is a rational attempt to limit the involvement of federal courts in the day to day management of state prisons. The Court therefore concludes that the PLRA does not unconstitutionally impair plaintiffs' contract rights. *See also Gavin*, 122 F.3d at 1091–92; *In-*

---

**15.** Plaintiffs again make the public rights/private rights distinction in the context of their due process argument. They cite *Hodges·v. Snyder*, 261 U.S. 600, 603, 43 S.Ct. 435, 67 L.Ed. 819 (1923), which limits the holding in *McCullough*—that once vested, a judgment cannot be abrogated by an act of Congress—by stating that for Due Process purposes, public rights may not become

vested, only private rights. This issue is not implicated in this case, however, for if a party can have no property right in the underlying order—the order is not final for due process purposes—it matters not whether it confers a public or a private right because it cannot become vested in either case. *See Gavin*, 122 F.3d at 1091 n. 10.

*mates of Suffolk County Jail,* 129 F.3d at 658–59.

## C. Equal Protection

 Plaintiffs next argue that the PLRA unconstitutionally violates the equal protection rights inherent in the Fifth Amendment. *See Mathews v. De Castro,* 429 U.S. 181, 182 n. 1, 97 S.Ct. 431, 50 L.Ed.2d 389 (1976) ("It is well settled that the Fifth Amendment's Due Process Clause encompasses equal protection principles."). Normally, a court will presume that legislation is valid and must uphold it unless it draws a classification that is not rationally related to a legitimate purpose. *See City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). On this issue, as in the context of their Due Process claim, plaintiffs urge this Court to employ a heightened scrutiny in this case because the PLRA acts to burden inmates' fundamental right of access to the courts. "[C]lassifications affecting fundamental rights are given the most exacting scrutiny.' *Clark v. Jeter,* 486 U.S. 456, 461, 108 S.Ct. 1910, 1914, 100 L.Ed.2d 465 (1988) (citation omitted). Such laws must be 'suitably tailored to serve a compelling state interest.' *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) ..." *United States v. Williams,* 124 F.3d 411, 422 (3d Cir.1997) (other citation omitted). However, where a statutory classification or distinction "neither burdens a fundamental right nor targets a suspect class,[16] we will uphold [it] so long as it bears a rational relation to some legitimate end." *Romer,* 116 S.Ct. at 1627.[17]

### 1. Fundamental Rights

 It goes without saying that for equal protection purposes, access to the courts is a fundamental right. *See Wolff v.*

*McDonnell,* 418 U.S. 539, 578, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Plaintiffs argue that the termination provisions of the PLRA—by limiting the right of inmates to obtain prospective relief in a way that other classes are not limited—unconstitutionally burdens this right. The Court must, however, reject this argument because the PLRA does not close the courthouse doors to prisoners. In making this argument, plaintiffs conflate the right of access with the right to relief and they are not the same thing. The PLRA does not prevent inmates from presenting claims of constitutional violations to a court, nor does it prevent courts from remedying any established violations; it simply limits the form and type of relief inmates may be awarded. This certainly gives inmates " 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.' " *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 2180, 135 L.Ed.2d 606 (1996) (quoting *Bounds v. Smith,* 430 U.S. 817, 825, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)); *see also Gavin,* 122 F.3d at 1089. Thus, because the legislation does not burden a fundamental right, the Court will not engage in a strict scrutiny analysis of the PLRA.

### 2. Rational Basis

 Rational basis review is an extremely deferential form of review for it is the "role of the political branches to shape the institutions of government in such fashion as to comply with the laws and the Constitution." *Lewis,* 116 S.Ct. at 2179. A statute survives such review so long as it "bear[s] a rational relationship to an independent and legitimate legislative end." *Romer,* 116 S.Ct. at 1627. Where "there are plausible reasons for [the legislative] action, [the court's] inquiry is at an end. It is, of course, 'constitution-

---

**16.** Plaintiffs do not contend that inmates are a suspect class.

**17.** In the context of their equal protection arguments, plaintiffs assert that the PLRA violates the Tenth Amendment by limiting the right of state officials to settle litigation. *See United States v. Bekins,* 304 U.S. 27, 51–52, 58 S.Ct. 811, 82 L.Ed. 1137 (1938) ("It is of the essence of sovereignty to be able to make contracts and give

consents bearing upon the exertion of government power."). The Court rejects this contention. The PLRA does not prohibit states from entering into "private settlement agreements." 18 U.S.C. § 3626(c)(2). Instead, the PLRA merely limits the jurisdiction of federal courts with respect to enforcement of such agreements. Thus, state sovereignty is in no way threatened by the PLRA.

ally irrelevant whether this reasoning in fact underlay the legislative decision.' " *U.S. Railroad Retirement Board v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980) (quoting *Flemming v. Nestor*, 363 U.S. 603, 612, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960)). Moreover,

> the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record. Finally, courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality.

*Heller v. Doe*, 509 U.S. 312, 319–21, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993).

 A discernable—and legitimate— purpose of the PLRA is to preserve "state sovereignty by protecting states from overzealous supervision by the federal courts in the area of prison conditions litigation." *Plyler*, 100 F.3d at 374. This purpose is borne out by the PLRA's legislative history, which recites:

> that the drafters intended the Act to 'address the alarming explosion in the number of frivolous lawsuits filed by State and Federal prisoners,' to 'mak[e] it much more difficult for Federal judges to issue orders directing the release of convicted criminals from prison custody,' 141 Cong. Rec. 14,413 (1995) (statement of Sen. Dole), and to wrest control of state penitentiaries from federal courts so that states 'will be able to run the prisons as they see fit unless there is a constitutional violation,' *id.* at 14,419 (statement of Sen. Abraham).

*Inmates of Suffolk County Jail*, 129 F.3d at 660. The legislative history thus more than adequately demonstrates at least one legitimate goal: the desire to limit federal court oversight of state prisons. The way Congress has chosen to reach this goal—the PLRA—is a perfectly rational means to that

end. The PLRA therefore amply satisfies the rational basis test.

Plaintiffs argue that in passing the PLRA, Congress was motivated by an animus toward inmates and that where a statute "singl[es] out a certain class of citizens for disfavored legal status or general hardship[ ]," *Romer*, 116 S.Ct. at 1628, it violates the equal protection clause. Plaintiffs have thus teased from the holding in *Romer* a new constitutional standard of review in equal protection cases, something greater than the rational basis test described above. The Court does not believe that the Supreme Court established a new standard, for it found that the *only* purpose of the statute at issue in that case was animus toward homosexuals, which is simply not legitimate:

> Even laws enacted for broad and ambitious purposes often can be explained by reference to legitimate public policies which justify the incidental disadvantages they impose on certain persons. Amendment 2 [the law at issue], however, in making a general announcement that gays and lesbians shall not have any particular protections from the law, inflicts on them immediate, continuing, and real injuries that outrun and belie any legitimate justifications that may be claimed for it. We conclude that, in addition to the far-reaching deficiencies of Amendment 2 that we have noted, the principles it offends, in another sense, are conventional and venerable; a law must bear a rational relationship to a legitimate governmental purpose . . . and Amendment 2 does not.

*Romer*, at 1628–29. The PLRA does not have the same sweeping effect, for § 3626(b) simply narrows the protections afforded inmates to the constitutional minimum, it does not eliminate those protections.

 Even if plaintiffs are correct, however, and courts must engage in a form of heightened scrutiny where there is evidence of some animus, the discussion of the legislative history above sufficiently demonstrates legitimate reasons for the PLRA; plaintiffs have not come forward with evidence that animus was the principal motivat-

ing factor.[18] Moreover, it has been established that in some contexts states may, without violating the equal protection guarantees of the Fourteenth Amendment, impose greater burdens on inmates as a class; while prisoners are certainly not stripped of all constitutional rights by the fact of their incarceration, *see, e.g., Turner v. Safley,* 482 U.S. 78, 84–85, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), those rights may be limited and, in some cases, eliminated. *See, e.g., Richardson v. Ramirez,* 418 U.S. 24, 54, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974) (holding that convicted felons who have served their time may be disenfranchised by the state without violating the Fourteenth Amendment). In this case, the burden imposed by the PLRA—that inmates prove a "current and ongoing violation" of a federal right—is not unreasonable and does not violate the equal protection rights of inmates. For all these reasons, the Court concludes that the PLRA does not violate the plaintiffs' equal protection rights. *See also Dougan,* 129 F.3d at 1427; *Gavin,* 122 F.3d at 1089–90; *Inmates of Suffolk County Jail,* 129 F.3d at 659–61; *Plyler v. Moore,* 100 F.3d 365, 373–74 (4th Cir.1996).

## III. MOTIONS FOR CONTEMPT

Having concluded that the termination provisions of the PLRA at issue are constitutional, the next question for the Court is what effect a finding of contempt will have on defendants' Motion to Terminate. Plaintiffs contend that regardless of the constitutionality of the termination provisions, if the Court finds defendants in contempt, it may stay defendants Motion to Terminate or hold it in abeyance until the contempt is purged. The Court may do so, plaintiffs argue, either pursuant to its inherent contempt power or through the equitable doctrine of "unclean hands." [19]

■■■■ "[I]t is firmly established that '[t]he power to punish for contempt is inherent in all courts.' [*Ex Parte Robinson,* 19 Wall. 505, 510, 22 L.Ed. 205 (1873)]. This power reaches both conduct before the court and that beyond the court's confines, for '[t]he underlying concern that gave rise to the contempt power was not ... merely the disruption of court proceedings. Rather, it was disobedience to the orders of the Judiciary, regardless of whether such disobedience interfered with the conduct of trial.'" *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (quoting *Young v. United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 798, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987)). This inherent contempt power is not unlimited, however. Indeed, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Id.* (citing *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980)). Moreover, although the power to hold one in contempt is exercised at a court's discretion, it is not exercised absent standards.

■■■■ The Third Circuit recently enunciated an important limit on the imposition of civil contempt sanctions in *Harris v. City of Philadelphia,* 47 F.3d 1311 (3d Cir.1995).

---

**18.** Plaintiffs argued that this district is uniquely situated to understand that animus to prisoners motivated passage of the PLRA because congressional unhappiness with *Harris v. City of Philadelphia,* 47 F.3d 1311 (3d Cir.1995), served as a catalyst for the PLRA's enactment. The Court does not doubt that prisoners are considered by the public to be an unpopular class and that such unpopularity helped usher the PLRA through Congress. Nonetheless, even under a heightened rationality test, there is sufficient evidence that legitimate purposes motivated passage as well. Moreover, the evidence of animus submitted by plaintiffs—such as fiery statements by members of the Senate like "criminals ... deserve to be punished.... [T]heir lives should, on the whole be describable by the old concept known as 'hard time.'" Sen. Abraham, 141 Cong.Rec. at

S14419—must, in the words of the First Circuit, "be taken with a grain of salt—elected officials, after all, have been known to strike poses for public consumption—the most that fairly can be said is that oratory of this sort may evince a philosophical shift; it hardly betokens an impermissible animus." *Inmates of Suffolk County Jail,* 129 F.3d at 661.

**19.** The contempt motions involve civil, not criminal, contempt sanctions against defendants. This distinction is important, not only because imposition of criminal, as opposed to civil, sanctions entails different procedural safeguards, but because the scope of the Court's power to order sanctions also differs depending on which type of contempt is found by the Court.

Unhappy with overcrowding at a Philadelphia prison, a group of inmates filed a civil rights complaint in 1982, alleging that prison conditions violated various provisions of the United States Constitution. In 1986, the suit was expanded to include the entire Philadelphia prison system. Later that year, the inmates entered into a settlement agreement with the City in which the City agreed to construct new prisons and to do so according to a specified schedule. This agreement was approved by the court in the form of a consent decree that same year. A second consent decree was approved by the Court in 1991, after it became clear that the conditions of the 1986 decree were not going to be met, and a further amendment was stipulated in 1992. The provisions of the 1991 consent decree and its amendment were at issue in *Harris*.

In *Harris*, the district court imposed civil contempt sanctions; the sanctions arose out of the failure of the City to submit two planning documents by a specified date. When it failed to submit those documents, the district court *sua sponte* found "a pattern of contempt" by the City, imposed fines and ordered the documents submitted. After the City again failed to submit the documents—having received an extension of time for submission of one of them—the district court imposed a second contempt sanction. This second sanction imposed by the court against the City was dismissal of its pending motion to modify the consent decree. For the reasons· discussed below, the Third Circuit held that this sanction exceeded the authority of the district court.

The plaintiffs cite *Harris* for the proposition that "[a] party may not rely on its unilateral interpretation of the requirements for compliance in complex institutional reform litigation as an excuse for noncompliance," *id.* at 1325 (citation omitted), and argue that by amending the clothing regulations and review procedures, defendants have done just that. Defendants note, however, that *Harris* also stands for the proposition that civil contempt sanctions must exert a coercive, rather than punitive, effect. Thus, "[i]f the contemnor cannot purge through an affirmative act, the sanc-

tion has no coercive effect and exceeds the appropriate bounds of civil contempt." *Id.* at 1328. Although civil contempt can also serve to compensate, the Third Circuit in *Harris* found that dismissal of the motion to modify was neither coercive nor compensatory and instead was purely punitive, an inappropriate basis upon which to issue a sanction for civil contempt. *See also Robin Woods Inc. v. Woods,* 28 F.3d 396, 400 (3d Cir.1994) ("Sanctions for civil contempt serve two purposes: 'to coerce the defendant into compliance with the court's order and to compensate for losses sustained by the disobedience.'" (quoting *McDonald's Corp. v. Victory Investments,* 727 F.2d 82, 87 (3d Cir.1984))); *Gregory v. Depte,* 896 F.2d 31, 34 (3d Cir.1990) ("We first consider whether this contempt sanction may be justified as civil. Such a sanction must coerce or compensate.").

Plaintiffs seek to have defendants ordered into compliance with the terms of the Consent Decree. In doing so, they maintain that the Court may either dismiss defendants' Motion to Terminate, or hold that Motion in abeyance until defendants purge their contempt. It is clear, however, that should this Court find defendants in contempt, it may not sanction them unless the sanction is capable of either coercing compliance, or of compensating plaintiffs for past violations. Defendants argue that *Harris* is precisely on point on this issue. Ordering their Motion to Terminate dismissed or held in abeyance, they argue, would impose a sanction which is purely punitive.

The Third Circuit in *Harris* concluded that the sanction of dismissing the motion to modify was not "designed to have a coercive effect impelling the City to submit at long last the tardy [documents] . . ., because it had no provision explicitly permitting the City to refile the motion once the documents were submitted." *Harris,* 47 F.3d at 1329. The court apparently, therefore, left open the possibility that had the dismissal of the motion to modify been without prejudice—allowing the City to re-file after complying with the order—the sanction would have had a coercive effect and thus would have fit within the framework of civil contempt. If so, it

might be argued that in this case, holding defendants' Motion to Terminate in abeyance, or dismissing it without prejudice, would have a coercive effect since defendants would be able to seek termination of the Consent Decree under the PLRA, after coming into compliance.

While at first blush, this argument seems plausible, the Court must reject it. The power to hold one in contempt is an equitable one and as such, "where the purpose is to make the defendant comply, the [court] ... must then consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *United States v. United Mine Workers of America,* 330 U.S. 258, 304, 67 S.Ct. 677, 91 L.Ed. 884 (1947). In other words, there must be a balancing of the equities.

Keeping in mind first, that the Court has found the termination provisions of the PLRA to be constitutional, and second, that plaintiffs have not attempted to establish the facts necessary to meet the standard which would permit the Court to deny defendants' Motion to Terminate, the Court concludes that requiring defendants to comply with the terms of the Consent Decree at this time would be little more than an empty gesture. Accepting, *arguendo,* plaintiffs' position, and considering the Court's conclusion regarding the PLRA's constitutionality, as soon as defendants came into compliance, the Decree would lose all force in federal court under the terms of an order entered pursuant to the termination provisions of the PLRA. Thus, such an action on the part of the Court would not only be a Pyrrhic victory for plaintiffs, it would, in practice, be a punishment of the defendants: the effect would merely be to temporarily force defendants into a possibly costly compliance with rules and procedures they will immediately thereafter be in a position to abandon or restructure. This neither aids plaintiffs, nor compels defendants, and the Court will not order it.

In this respect, the Third Circuit's opinion in *Latrobe Steel Co. v. United Steelworkers,* 545 F.2d 1336 (1976), is instructive. In that case, the district court had issued an injunction prohibiting a union from refusing to cross a "stranger picket line." When union members failed to comply with the order, the district court sanctioned the union in the form of fines payable to the United States. On appeal, the circuit court found that the district court lacked jurisdiction to issue the underlying injunction. The question then became whether a contempt sanction can survive the invalidation of the order the contemnors were charged with violating. After concluding that the ordered sanction was civil in nature, and that the purpose of the civil sanction was to coerce compliance with the order the court concluded that "coercive contempt cannot survive the overturning of the underlying injunctive order...." *Id.* at 1348.

Moreover, there is precedent for refusing to impose a coercive contempt sanction when a change in law invalidates a court order, even where the alleged contemnor has flagrantly ignored that order. In *Wheeling Bridge* (discussed above) the Supreme Court refused both to enjoin reconstruction of the bridge and to sanction the bridge builders for their disobedience of the lower court order enjoining reconstruction:

> A motion is now made for attachments against the persons mentioned for this disobedience and contempt.
>
> A majority of the court are of opinion, inasmuch as we have arrived at the conclusion that the act of congress afforded full authority to the defendants to reconstruct the bridge, and the decree directing its alteration or abatement could not, therefore, be carried into execution after the enactment of this law, and inasmuch as the granting of an attachment for the disobedience is a question resting in the discretion of the court, that, under all the circumstances of the case, the motion should be denied.

*Id.* at 436.[20]

A somewhat different issue is raised with respect to plaintiffs request for compen-

---

**20.** *Harris,* plaintiff's contend, is inapposite because, although the sanction of dismissing the

motion to modify was deemed to be inappropriate, the City in that case continued to remain

satory sanctions for violation of the clothing provisions of the Consent Decree. The *Latrobe Steel* court explains that:

> Although the cases do not fully explicate the reasoning behind the general principle that compensatory civil contempt does not survive the abrogation of the underlying decree, the precept is, in our opinion, a sound one. A compensatory contempt proceeding is similar in several particulars to an ordinary damage action, since it is in essence an action between private parties, with rights created by the injunctive order rather than by a statute or the common law. The invalidation of an injunction in such a setting is equivalent to a holding that the plaintiff never had a legally cognizable interest which the defendant was obliged to respect, a conclusion which should be distinguished from the nearly unconditional duty of obedience owed by a defendant to a court. The *United Mine Workers'* doctrine thus recognizes that a private party should not profit as a result of an order to which a court determines, in retrospect, he was never entitled.

*Latrobe Steel,* 545 F.2d at 1345–46. In this case, unlike *Latrobe Steel,* the Court will merely terminate the prospective effect of the Consent Decree; it is not finding that "the plaintiff[s] never had a legally cognizable interest" in the Decree. Thus, *Latrobe Steel* does not answer the issue presented by plaintiffs' request for compensatory sanctions: the question of whether, if, by violating the clothing provisions of the Decree, defendants have deprived plaintiffs of a right, plaintiffs are entitled to compensation by reason of the loss of that right even if the Decree is thereafter terminated. Neither can the Court rely on *Harris* to find that imposition of compensatory sanctions would be a form of punishment—compensatory damages, by their very nature, are not punitive. The Court will therefore make findings with respect to plaintiffs' claim that they are entitled to compensation by reason of the amendments to the clothing regulations uni-laterally imposed on them by defendants in violation of the Consent Decree.

The Consent Decree provides that "[d]efendants shall permit residents to wear civilian clothing when the residents are housed in general population except to the extent that the superintendent of each institution requires institutional issue to be worn for work. However, defendants reserve the right to require residents to wear specific articles of clothing issued solely for the purpose of visitation during a resident's presence in the visiting areas of the institution. *Furthermore, defendants reserve the right to impose reasonable regulations with respect to civilian clothing on the basis of safety, sanitary and security considerations.*" Consent Decree ¶ XVII (emphasis added).

Defendants have presented evidence that, after the escape of six inmates, they amended the clothing regulations out of a concern for the safety of the public and security of correctional institutions. Plaintiffs argue that this concern was not a primary motivating factor for the change in regulation. A report released by Commissioner Horn detailed "Primary Causes of Escape" and "security lapses that allowed escape." The parties have stipulated that "[t]he issue of inmate access to civilian clothing is listed only thereafter in the report as a concern related to the escape." Stipulation of Uncontested Fact at ¶ 14. Defendants cite this security concern as a principal reason for the change in clothing policy.

The Consent Decree does not require that safety and security concerns be the sole or even primary motivating factor. It expressly reserves to defendants the right to alter clothing regulations if the alteration is "reasonable" and the concern for safety or security is a "basis" of the alteration. *See id.* at ¶¶ 9–14 (detailing Report of Commissioner Horn on escape of prisoners). In this case, the fact that inmates' possession of civilian clothing contributed to the escape is ample proof that the defendants' safety and security

---

obliged to produce the documents at issue. Here, in contrast, their argument continues, granting defendants' Motion to Terminate, without holding them in contempt, will relieve defendants of all their current obligations. That is true but in this case, unlike in *Harris,* the underlying decree is being invalidated. Thus, the situation in the instant matter is like that in *Wheeling Bridge* and, like the *Wheeling Bridge* Court, this Court will not find defendants in contempt.

concerns are "reasonable." The Court further finds that those concerns served as one of the bases for the amendment to the clothing regulations. The Court therefore concludes that defendants have not violated the Consent Decree with respect to the amended clothing regulations and will not order compensatory sanctions.

In light of the Court's earlier conclusion—that even had defendants violated other provisions of the Consent Decree it will not hold them in contempt for the purpose of making them comply with those provisions of the Decree—the Court will not make findings as to whether defendants have violated any other provisions of the Consent Decree or its amendments.[21] Although the Consent Decree has not yet been terminated, absent a finding of a "current and ongoing" violation of a federal right—which plaintiffs have expressly declined to attempt to establish—the Court must promptly terminate the Decree.

## IV. APPLICATION OF THE EQUITABLE DOCTRINE OF "UNCLEAN HANDS"

■■■ Relying on their contentions with respect to defendants' contempt, plaintiffs assert that defendants are invoking the termination provisions of the PLRA with "unclean hands." Thus, even if the Court will not order contempt sanctions in this case, the question remains whether defendants may be barred, under the doctrine of "unclean hands"—from seeking the equitable relief of termination of the Consent Decree pursuant to the PLRA's termination provisions. A court acts out of concern for its own integrity when it refuses to hear a claim because the party seeking relief enters with "unclean hands." See Gaudiosi v. Mellon, 269 F.2d 873, 881–882 (3d Cir.1959). To succeed with the defense of "unclean hands," the conduct of the party seeking relief must be inequitable and must involve the subject matter of his or her claim. See Ciba–Geigy Corp. v.

Bolar Pharmaceutical Co., Inc., 747 F.2d 844, 855 (3d Cir.1984). "What is material is not that the plaintiffs hands are dirty, but that he dirtied them in acquiring the right he now asserts, or that the manner of dirtying renders inequitable the assertion of such rights against the defendant." Carney v. School District of Philadelphia, 633 F.Supp. 1273, 1285 (E.D.Pa.1986), This doctrine has been defined as barring a claim "only if '(1) a party seeking affirmative relief (2) is guilty of conduct involving fraud, deceit, unconscionability, or bad faith (3) directly related to the matter in issue (4) that injures the other party and (5) affects the balance of equities between the litigants.'" Tang v. Hwang, 799 F.Supp. 499, 505 (E.D.Pa.1992) (quoting Castle v. Cohen, 676 F.Supp. 620, 627 (E.D.Pa. 1987), aff'd in part and remanded in part on other grounds, 840 F.2d 173 (3d Cir.1988)).

■■■ Federal courts clearly retain broad equitable powers under the doctrine of "unclean hands." See, e.g., Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 814–15, 65 S.Ct. 993, 89 L.Ed. 1381 (1945) ("The guiding doctrine in this case is the equitable maxim that 'he who comes into equity must come with clean hands.' ... This maxim necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant.") (affirming dismissal of patent suit in which plaintiff entered court with "unclean hands"). A court may exercise those powers in many circumstances, even in cases in which a party is proceeding under statute. Of course, the requirement remains that the misconduct alleged by those invoking "unclean hands" must relate to the subject matter of the statute at issue. See Toomer v. Witsell, 334 U.S. 385, 393, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948).

■■■ In the context of congressionally created injunctive remedies, the Supreme Court has said that "[u]nless a statute in so

---

**21.** The Court's conclusion that it need not reach the issue of whether or not the defendants violated provisions of the Consent Decree or its Amendments moots a number of subsidiary issues, such as whether the body of Magistrate Judge Hall's Report and Recommendation was incorporated into the 1983 Amendment to Stipulation and the proper interpretation of Federal Rule of Civil Procedure 65(d) in the context of this case. For the same reasons the Court declines to reach the question of whether defendants are in contempt, it will not reach the merits of these subsidiary issues, although it commends the parties on their thorough and able briefing and argument on these issues.

many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946) (absent a "clear and valid legislative command" courts retain their powers of equity. *See also Weinberger v. Romero–Barcelo*, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). Courts may, nonetheless, be barred by statute from exercising some or all of their equitable powers. *See, e.g., Operating Engineers Local Union 3 v. Burroughs*, 417 F.2d 370 (9th Cir.1969) (holding that "unclean hands" defense was not available where union employee sought relief under federal statute but had failed to exhaust union remedies); *United States v. Martell*, 844 F.Supp. 454 (N.D.Ind. 1994) (holding that doctrine of "unclean hands" does not apply when proceeding under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") because the "unclean hands" doctrine cannot be used to frustrate the law or public policy). The Third Circuit has also been reluctant to find an "unclean hands" exception in statutes. Thus, when the government argued that there was an implied "unclean hands" exception to the statute prohibiting introduction of unlawfully obtained wire tap evidence to the grand jury, the Third Circuit held that no such exception applied. *See In re Grand Jury*, 111 F.3d 1066, 1077 (3d Cir.1997); *see also Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86, 90 (3d Cir.1988) (holding that "doctrines such as caveat emptor and 'clean hands,' which in some cases could bar relief regardless of the degree of culpability of the parties, do not comport with congressional objectives" as codified in CERCLA and thus do not apply under that statute).

The Supreme Court has also recently spoken to this issue. In *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995), the plaintiff, Christine McKennon, sought a remedy under the Age Discrimination in Employment Act ("ADEA"), a statute which explicitly provides

that a court has discretion to "grant such legal or equitable relief as may be appropriate to effectuate the purpose of [the Act]." 29 U.S.C. § 626(b). After firing her for purportedly illegitimate reasons, her former employer discovered that McKennon had engaged in conduct that would have provided legitimate grounds for dismissal.[22] This evidence, they claimed, barred her from proceeding under the ADEA, a form of "unclean hands."

The Supreme Court in *McKennon* held that the reason the employer had initially given for firing McKennon was in violation of the ADEA. It then went on to refuse consideration of the "unclean hands" doctrine. "Equity's maxim that a suitor who engaged in his own reprehensible conduct in the course of the transaction at issue must be denied equitable relief because of 'unclean hands,' a rule which in conventional formulation operated *in limine* to bar the suitor from seeking the aid of the equity court, .. *has not been applied where Congress authorizes broad equitable relief to serve important national policies.*" *Id.* at 360, 115 S.Ct. 879 (emphasis added). Thus the Court has "rejected the unclean hands defense 'where a private suit serves important public purposes.'" *Id.* (quoting *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 138, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968) (holding that "unclean hands" defense does not apply in Sherman Act and Clayton Act Antitrust actions)); *see also Pan–American Petroleum & Transport Co. v. United States*, 273 U.S. 456, 47 S.Ct. 416, 71 L.Ed. 734 (1927) (rules of equity "will not be applied so as to frustrate purpose of laws or thwart public policy").

The PLRA serves important national policies, and because barring defendants' Motion to Terminate under the doctrine of "unclean hands" would serve to frustrate the purpose of the law and thwart public policy, the Court concludes that plaintiffs may not invoke the "unclean hands" doctrine to bar defendants' Motion to Terminate.

---

**22.** Plaintiff McKennon admitted during a deposition that in her last year of employment, she had copied several of her employer's confidential documents. While the Supreme Court held that this evidence did not bar her ADEA claim, it was nonetheless relevant to the question of damages.

## V. RELIEF

■ Under 18 U.S.C. § 3626(b)(3), a court should not terminate relief if it finds that there is a "current and ongoing violation of the Federal right" and that the relief is narrowly drawn, extends no further than necessary and is the least intrusive means possible to correct the violation. The statute clearly defines prospective relief as "all relief other than compensatory monetary damages," *id.* § 3626(g)(7) and relief is further defined to include "consent decrees." *Id.* § 3626(g)(9). In combination with the legislative history discussed above, the Court concludes that the statute is unambiguous: pursuant to the PLRA, consent decrees are to be "terminated" upon motion unless there is a showing of "current and ongoing violations" of a federal right.

Because the Court has determined that the termination provisions of the PLRA are constitutional, because it has denied the contempt motions, and because it will not bar defendants' Motion to Terminate under the doctrine of "unclean hands," the Court will terminate the Consent Decree under the provisions of the PLRA. In applying these provisions, the Court will follow the literal language of the statute and "terminate" the decree, not vacate it. The Second Circuit in *Benjamin v. Jacobson,* 124 F.3d 162 (2d Cir. 1997), *reh'g held en banc* February 25, 1998,[23] after a complicated analysis of the language of the PLRA, chose to read § 3626 of the Act such that "the statutory definition of relief, which includes consent decrees, should preferably be read to mean that it includes remedies arising out of or issued pursuant to the consent decree," but not the consent decree itself. *Id.* at 168. The consequence of this interpretation is that the obligations and agreements under the consent decree are left intact, even when the relief ordered by the decree is terminated. Otherwise stated, the *Benjamin* court held that the PLRA merely strips federal court of jurisdiction over non-federal remedies. With this understanding of the termination provisions, the court in *Benjamin* proceeded to find the PLRA constitutional, noting, however, in several in-

stances that that conclusion was "predicated on our interpretation of the termination provision as limiting federal jurisdiction over the non-federal aspects of the Consent Decrees rather than as making those aspects of the Decrees void." *Id.* at 170.

While the Court does not adopt this interpretation of the PLRA's termination provisions, "Congress chose to use the verb 'terminate' and to eschew the verb 'vacate.' The distinction between these two words is clear: 'terminate' means 'to put an end to' or 'to end,' Black's Law Dictionary at 1471, whereas 'vacate' means 'to annul' or 'to render ... void,' *id.* at 1548." *Inmates of Suffolk County Jail,* 129 F.3d at 662. As the First Circuit has noted, "this distinction may well possess practical significance." *Id.; See also Benjamin,* 124 F.3d at 178–79. While terminating the Consent Decree ends its future injunctive effect, the decree itself is not "annulled," as it would be if it were vacated. The Court will therefore, as it has said, "terminate" and not "vacate" the Decree.

■ Having reached this conclusion, the Court must turn to plaintiffs' alternative requests: to have this Court "certify" transfer to the Commonwealth Court and "not divest jurisdiction" pending any action in state court. This latter request will be treated as one to stay implementation of the termination order. Plaintiffs seek to have this case transferred so as to give them an opportunity to attempt to enforce the Consent Decree under state law, free of the termination requirement of the PLRA. Plaintiffs point to no statute or rule which would authorize this Court to "certify" such a transfer and it declines to do so. Nonetheless, the Court recognizes that plaintiffs may have valid arguments that the Consent Decree creates binding obligations under state law—although it expresses no opinion as to the merits of such arguments. It will therefore examine the question of whether the Court should stay termination of the Decree pending either state court action or appeal of this decision.

---

**23.** The Court notes that the Second Circuit granted rehearing *en banc* in *Benjamin*; the rehearing was held on February 25, 1998 and the Second Circuit has not yet issued an opinion.

After engaging in the analysis outlined above, the Second Circuit in *Benjamin* concluded that it was appropriate to maintain a stay, keeping the consent decree at issue in that case in force. Mindful that the issues at stake in the litigation before it had closely divided those courts which had addressed them, the Second Circuit ordered the stay maintained "until the Supreme Court has acted on any possible petition for certiorari." *Id.* at 180. Although in one respect this Court reaches an outcome not too dissimilar from that of the Second Circuit, the Court must respectfully disagree with this part of the Second Circuit's holding and will not order a stay in this case. Because the statute is unambiguous on this point and the Court has concluded that the termination provisions of the PLRA are constitutional, the Court will not stay termination of the Decree.

## VI. CONCLUSION

Based on all of the foregoing, the Court concludes that the termination provisions of the PLRA are constitutional and therefore grants defendants their requested relief. The Consent Decree will be terminated. The Court also has determined that plaintiffs' contempt motions should be denied. Plaintiffs have requested two types of contempt sanctions and the reasons for denying their motions are likewise twofold: with respect to the request for coercive sanctions, the Court has concluded that in the circumstances of this case, such sanctions would be punitive in nature and thus will not impose coercive sanctions regardless of whether defendants have violated provisions of the Consent Decree; with respect to the request for compensatory sanctions arising from defendants' amendment of the clothing regulations, the same reasoning does not apply and the Court therefore addressed that claimed contempt and found that the amendment to the clothing regulations did not violate the Consent Decree. The Court additionally declines to bar defendants' Motion to Terminate based on the equitable doctrine of "unclean hands." Finally, the Court will neither stay termi-

nation in this case, nor order the case transferred to the Commonwealth Court.

An appropriate order follows.

## *ORDER*

**AND NOW,** to wit, this 27th day of April, 1998, upon consideration of defendants' Motion to Terminate All Outstanding Orders for Prospective Relief pursuant to the Prison Litigation Reform Act, Pub.L. No. 104–134, 110 Stat. 1321 (1996) (codified in part at 18 U.S.C. § 3626), filed September 23, 1997 (Doc. No. 775), plaintiffs' Motion in Opposition to Defendants' Motion to Terminate Preliminary Relief and in the Alternative to Declare the Prison Litigation Reform Act Unconstitutional or to Certify the Transfer of this Action's Consent Decree with Related Orders to the Commonwealth Court of Pennsylvania, filed September 30, 1997 (Doc. No. 776), plaintiffs' Motion to Have Defendants and Their Agents Held in Civil Contempt, filed October 8, 1997 (Doc. No. 778), defendants' Brief in Support of Constitutionality of Section 802 of the Prison Litigation Reform Act, filed October 7, 1997 (Doc. No. 779), defendants' Memorandum in Further Explication of the Relationship Between Plaintiffs' Motion for Contempt and Defendants' Motion to Terminate Prospective Relief, filed October 10, 1997 (Doc. No, 781), defendants' Response in Opposition to Plaintiff's Motion to Have Defendants and Their Agents Held in Civil Contempt, filed October 16, 1997 (Doc. No. 783), plaintiffs' Reply Memorandum, filed October 20, 1997 (Doc. No. 784), Defendants' Corrected Memorandum of Law in Opposition to Plaintiff's Motion to Have Defendants and Their Agents Held in Civil Contempt, filed October 21, 1997 (Doc. No. 788), Intervenor United States of America's Memorandum of Law Concerning the Constitutionality of the Challenged Provisions of the Prison Litigation Reform Act, filed October 22, 1997 (Doc. No. 791), plaintiffs' Amended Motion for Contempt, filed October 28, 1997 (Doc. No. 797), and defendants' Memorandum of Law in Support of Defendants' Response to Plaintiffs' Amended Motion for Contempt, filed November 6, 1997 (Doc. No. 805), after oral argument on November 19, 1997, for the

reasons set forth in the attached Memorandum, **IT IS ORDERED** as follows:

1. The termination provisions of the Prison Litigation Reform Act, 18 U.S.C. § 3626(b)(2), are constitutional.

2. Because the Court has found the termination provisions of the Prison Litigation Reform Act, 18 U.S.C. § 3626(b)(2), to be constitutional and because plaintiffs have not made a factual showing of a current and ongoing violation of a federal right as required by the Prison Litigation Reform Act, Defendants' Motion to Terminate All Outstanding Orders for Prospective Relief is **GRANTED** and the Consent Decree, as amended, is **TERMINATED.**

3. Plaintiff's Motion in Opposition to Defendants' Motion to Terminate Preliminary Relief and in the Alternative to Declare the Prison Litigation Reform Act Unconstitutional is **DENIED.**

4. Plaintiff's Motion to Certify the Transfer of this Action's Consent Decree with Related Orders to the Commonwealth Court of Pennsylvania is **DENIED.**

5. Plaintiff's Motion to Have Defendants and Their Agents Held in Civil Contempt and Amended. Motion for Contempt are **DENIED.**